(No. 64440 
)

BETTY WITHERELL, Appellant, v. JAMES I. WEIMER, Appellee.

*Opinion filed October 5, 1987.—Rehearing denied December 1, 1987.*

RYAN and CUNNINGHAM, JJ., took no part.

James L. Hafele, of Peoria, and Thomas H. Bleakley, of Detroit, Michigan, for appellant.

Heyl, Royster, Voelker & Allen, of Peoria (Lyle W. Allen, David R. Sinn, Roger R. Clayton and Karen L. Kendall, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

In *Witherell v. Weimer* (1981), 85 Ill. 2d 146 (*Witherell I*), this court held that the circuit court had improperly dismissed plaintiff Betty Witherell's malpractice complaint as not timely filed. The case was remanded to the circuit court for further proceedings on both the statute of limitations and the merits. After a

trial in the circuit court of Tazewell County, the jury returned a verdict for the plaintiff, establishing her damages as $500,000, but reducing the award by $200,000 for her 40% comparative negligence. The appellate court, with one justice dissenting, reversed and ordered a new trial (148 Ill. App. 3d 32), and we allowed the plaintiff's petition for leave to appeal (103 Ill. 2d R. 315). Defendant, Dr. James Weimer, did not file a petition for leave to appeal, but raises numerous grounds for cross-relief. (See 87 Ill. 2d R. 318.) Dr. Weimer's former partner, Dr. Russell Taubert, was also a defendant at trial but died during the pendency of these proceedings. The plaintiff did not move to substitute a representative of his estate "within 90 days after the death [was] suggested of record" (Ill. Rev. Stat. 1985, ch. 110, par. 2—1008(b)), and this court therefore dismissed the appeal as to Dr. Taubert.

The voluminous evidence introduced at trial concerning the plaintiff's medical history is summarized in the opinion of the appellate court. We will not restate the evidence here except as necessary for resolution of the issues addressed. Betty Witherell was treated by Dr. Weimer and his partner from 1963 until 1976. Under prescriptions from them, she took oral contraceptives containing estrogen from 1966 to 1974 with the exception of a short period in 1972. The defendant and his partner testified they had not authorized refills for that period, but the plaintiff's evidence showed that the prescription had been repeatedly renewed on the authorization of those physicians. For treatment of an ovarian deficiency the defendant also gave plaintiff some 21 estrogen injections in his office, most of them between 1970 and 1972. From 1972 until 1976 plaintiff gave herself estrogen injections, which Dr. Weimer had also prescribed, at home every week.

Plaintiff has suffered from a number of ailments, including bouts of thrombophlebitis, a condition of the vein marked by inflammation of its wall and blood clots (4 Schmidt, Attorneys' Dictionary of Medicine T-70 (1986)). She was hospitalized for this condition in 1967 and 1972. In 1976 the plaintiff was again hospitalized, but the defendant diagnosed only muscle soreness and nerve pain. Shortly thereafter she was diagnosed by another physician as suffering from post-phlebitic syndrome.

A jury instruction set forth the plaintiff's claim that the doctors were negligent in that they:

"a. Did not properly interpret, diagnose and treat the signs and symptoms of the plaintiff's condition of thrombo-phlebitis in April and May of 1976.

b. Did not timely recognize the presence of thrombophlebitis in plaintiff's legs in April and May of 1976.

c. Failed to prescribe drugs which were appropriate for the plaintiff, given her condition.

d. Continued to allow her to take birth control pills and estrogen notwithstanding that they knew that the plaintiff had thrombophlebitis or a past history of thrombophlebitis."

According to the plaintiff, the defendant's negligence resulted in serious and permanent injury to her. She testified that her legs are very painful, she has to use a cane or wheelchair to get around, she cannot stand for any period of time without suffering from leg swelling, and she has been unable to work or to participate in recreational activities. The defendant's explanation was that the plaintiff's illness resulted from an earlier trauma and from long periods of immobility and inactivity. Defendant also sought to portray her problems as largely psychological in origin.

In addition to the questions of liability and damages, evidence was presented on whether the plaintiff failed to file her complaint within two years of discovering her

cause of action and whether, even if the complaint was otherwise time-barred, the defendant's conduct equitably estopped him from asserting the statute of limitations defense. The jury returned a general verdict for the plaintiff. The trial judge entered judgment on the verdict and refused to subtract plaintiff's "collateral source" recovery, declaring section 2—1205 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1205) unconstitutional.

The appellate court held that the trial judge's failure to place the burden of proving plaintiff's comparative negligence on the defendant was error. Rather than simply reversing the deduction for the plaintiff's negligence, however, the appellate court determined that equity required a new trial. The appellate court also concluded *sua sponte* that the jury instructions did not require the jury to find that the defendant's negligence proximately caused the plaintiff's injury. In addition to these reasons for reversing, the appellate court ruled that the issue of equitable estoppel had already been decided in *Witherell I* and that this court's decision in favor of the plaintiff on the limitations bar was *res judicata*. Finally, the appellate court held that the "collateral source" statute was constitutional. In light of our ruling in *Bernier v. Burris* (1986), 113 Ill. 2d 219, upholding that statute, the plaintiff now agrees that any award is subject to set-off in the amount of $41,052.77.

The plaintiff maintains in this court, as she did below, that her award should not have been reduced for any negligence on her part. We first address, however, several of the more than 30 issues the defendant raises by way of cross-relief in support of his contention that the appellate court correctly required a new trial.

## I. LIMITATIONS AND ESTOPPEL

The statute of limitations bars actions "brought more

than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known *** of the existence of the injury." (Ill. Rev. Stat. 1977, ch. 83, par. 22.1.) Initially, the trial court had held that plaintiff's cause of action was barred by the statute of limitations. Concluding on the record as it then existed—the pleadings, affidavits and answers to interrogatories—that the action would be barred unless the defendant was equitably estopped by his conduct from asserting the defense, this court ruled in *Witherell I* that the plaintiff was "entitled to an opportunity to prove the allegations upon which the estoppel and her cause of action are based." (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 160.) On remand, the jury was instructed on both the statute of limitations and equitable estoppel and returned a general verdict for the plaintiff. In the appellate court, as here, the defendant argued that the trial judge erred in failing to order separate trials as to the statute of limitations and liability issues and that, in any event, the verdict was against the manifest weight of the evidence.

The appellate court did not address these questions because of its conclusion that *Witherell I* had already determined that the defendant was equitably estopped from asserting the limitations bar. Although there is some language in *Witherell I* which, taken out of context, may have suggested this result, this court held only that dismissal was improper and that the plaintiff should have a chance to prove the basis for the estoppel. (85 Ill. 2d 146, 160.) The parties agree that the appellate court erred in finding this question precluded by prior adjudication.

Defendant contends, though, that he was entitled to a bifurcated trial with separate juries on the limitations and liability questions. The defendant correctly notes that his position on the statute of limitations was inconsistent with his posture on liability. To prove the defense, the defendant had to show that, more than two years be-

fore plaintiff's complaint was filed on January 4, 1978, she knew or should have known of her injury and either knew or should have known that it was wrongfully caused. (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 156.) Of course, to establish that the plaintiff should have known that the injury was wrongful in origin would practically amount to a concession by the defendant on the questions of both his negligence and causation. According to the defendant it was manifestly unfair to place him in this no-win position that made it impossible to effectively argue the statute of limitations.

We know of no principle of law requiring a bifurcated trial. It was the defendant's insistence on maintaining two lines of defense in this case that put him in this situation, and the trial judge was not obliged to take unreasonable measures to increase the defendant's ultimate chances of success. Defendant's request for a bifurcated trial was properly denied.

The defendant next contends that the jury's findings—that the action was not barred by the statute of limitations or that the defendant was estopped from asserting the bar—were against the manifest weight of the evidence. Because the defendant did not submit special interrogatories, there is no way of knowing whether the jury found that the defendant failed to prove plaintiff's discovery of her cause of action more than two years prior to filing the complaint or whether it was proved but the defendant was estopped from asserting it. When there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the defendant, having failed to request special interrogatories, cannot complain. (See *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 294; *Fernandez v. Industrial Com.* (1978), 71 Ill. 2d 283.) We need address only the estoppel issue.

The defendant is estopped from asserting the limitations bar if the plaintiff's failure to act within the statutory period results from reasonable reliance on the defendant's conduct or representations. (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 159.) An intent to mislead, deceive or delay is not necessary. (85 Ill. 2d 146, 159.) The evidence discloses that plaintiff was diagnosed as having thrombophlebitis when she was hospitalized in both 1967 and 1972. Dr. Weimer testified that he told her during the 1972 hospitalization that there was a statistical correlation between birth control pills and thrombophlebitis and that there was a controversy in the scientific community on the question of causation. He said he gave the plaintiff his opinion at that time that the blood clots she had experienced in 1967 and again in 1972 were due to trauma and immobility and that the pill had nothing to do with the problem. He left it up to her whether or not to continue taking the pill. According to Dr. Weimer, he told the plaintiff during the 1972 hospitalization that she had a mild case of thrombophlebitis and that she had also had a case in 1967.

According to the plaintiff, she broached the subject of birth control pills with Dr. Weimer a couple of weeks after the July 1972 hospitalization. She had talked with her mother and overheard other women in the hospital saying that someone with blood clots should not take birth control pills. Plaintiff testified that Dr. Weimer laughed and told her that birth control pills would not harm her in any way and that her fears were based on an "old wives' tale." After a chiropractor advised her in 1974 that she should talk to Dr. Weimer about cutting down some of the medications she was taking, she again asked Dr. Weimer about the connection between her ailments and the pill. The plaintiff testified that Dr. Weimer again laughed and said that they had previously discussed the pill and that the pill did not harm her but

seemed to be on her mind; he suggested there were other methods of birth control available.

The plaintiff's account, and to an extent even the defendant's, supports a conclusion that the defendant made representations to her that tended to alleviate her concerns about the birth control pill and consequently delayed any action on her part to seek relief. That the defendant also denied much of the plaintiff's testimony does not render a finding for the plaintiff against the manifest weight of the evidence. The jury heard the evidence and was entitled to credit the plaintiff.

Citing *Dill v. Widman* (1952), 413 Ill. 448, the defendant argues, however, that he can only be estopped if the plaintiff had no knowledge of or "convenient means" of knowing the true facts concerning the birth control pill. But this asserted requirement is simply an aspect of the reasonableness of a patient's reliance. A physician and his patient stand in a fiduciary relation, and "the patient normally reposes a great deal of trust and confidence in the doctor, accepting his recommendations without question." (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 159.) Regardless of what the plaintiff may have heard, we believe that in this context she was entitled to rely on her physician's opinion, and the defendant cannot avoid estoppel by pointing to other sources that the plaintiff could have consulted.

In a related contention, the defendant claims that the trial judge erred in failing to instruct the jury on the four-year statute of repose. In addition to the two-year statute of limitations, which commences to run with the plaintiff's discovery, an action is barred if "brought more than 4 years after the date on which occurred the act or omission or occurrence alleged" to have caused the injury. (Ill. Rev. Stat. 1977, ch. 83, par. 22.1.) We find no reversible error in the trial court's refusal to instruct on the statute of repose because the principle of equitable

estoppel applies to the repose period as well as the limitations period.

## II. LIABILITY

Dr. Phillip Immesoete, plaintiff's first expert witness, testified that doctors commonly rely on the Physician's Desk Reference (PDR), an annually published reference book in which drug manufacturers provide information on their products. A "contraindication" listed in the PDR is a reason not to use the drug. Dr. Immesoete testified that the 1970 PDR listed thrombophlebitis as a contraindication for the oral contraceptive prescribed to the plaintiff, and he believed that in such a situation the contraceptive should not have been used. Product information from the 1971 PDR on a non-oral estrogen also listed thrombophlebitis as a contraindication. Dr. Immesoete gave his opinion that a reasonably well-qualified physician would have stopped the estrogens when the plaintiff experienced thrombophlebitis in 1967 and would not have prescribed them thereafter. On the question of causation, Dr. Immesoete stated that the estrogens administered to Betty Witherell caused or contributed to the thrombophlebitis for which she was hospitalized in 1967 and 1972. His opinion regarding the relationship between estrogens and thrombophlebitis was based upon his reading, the PDR, and his experience and discussions with other physicians.

Dr. Immesoete also testified as to the standard of care and causation concerning the defendant's failure to prescribe anticoagulation therapy in 1976. He stated that the failure to give her anticoagulants was unacceptable and caused or contributed to the progression of her thrombophlebitis.

Dr. Robert Laird, a physician and clinical pharmacologist who was not licensed to practice medicine in any State, also testified on the plaintiff's behalf. He stated

that the PDR is a standard for physician conduct, that a contraindication means the drug should not be used at all in that circumstance, and that prescribing against contraindications is not in conformity with the standard of physician conduct. Dr. Laird believed that the estrogens prescribed for the plaintiff caused her thrombophlebitis as well as post-phlebitic syndrome. In addition to the "retrospective" studies forming the basis of the early PDR contraindication, Dr. Laird testified that possibly half a dozen "prospective" studies now show a relationship between estrogens and blood clotting.

Dr. Fred White, the defendant's expert, substantially contradicted the opinions of the plaintiff's experts. Following a long hypothetical question, Dr. White stated that in his opinion, the various aspects of the treatment rendered by the hypothetical defendant did not deviate from that of reasonably competent physicians. Dr. White denied that the PDR is intended to be authoritative and stated that the physician must use his professional judgment in prescribing. On the question of causation, Dr. White referred to studies which tended to establish that estrogens do not cause thrombophlebitis; he felt that the consensus of opinion was that there was no proven causal relationship.

The defendant argues that the jury's findings that he was negligent and that his treatment caused the injuries suffered by the plaintiff were against the manifest weight of the properly admitted evidence. These contentions will be treated in turn.

## A. NEGLIGENCE

To prove negligence in a medical malpractice action, the plaintiff must show that the treatment she received deviated from the appropriate standard of care. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256.) The defendant first argues that the testimony by Dr. Laird was im-

proper under the rule in *Dolan v. Galluzzo* (1979), 77 Ill. 2d 279. In *Dolan*, the plaintiff offered the expert testimony of an orthopedic surgeon in an attempt to establish that the defendant, a podiatrist, was negligent. This court held that expert testimony establishing a standard of care could come only from an expert licensed in the same "school of medicine" as the defendant. There is no dispute that both Dr. Laird and the defendant are medical doctors, and so the concern underlying *Dolan*—that "inequities would be occasioned" by holding a podiatrist to the standards of a medical doctor (77 Ill. 2d 279, 283)—does not exist here. Language in *Dolan*, which was criticized in a dissenting opinion, suggested, however, that an expert must actually hold a license in order to testify. (See also *Purtill v. Hess* (1986), 111 Ill. 2d 229, 243; cf. *Greenberg v. Michael Reese Hospital* (1980), 83 Ill. 2d 282.) Whether or not a license is in fact required, we are unable to perceive how the fact that Dr. Laird did not hold such a license prejudiced the defendant here. Dr. Laird had received not only an M.D. degree, but also a master's degree in pharmacology. He had worked for pharmaceutical manufacturers, where his responsibilities included writing drug labelling and PDR entries and conducting research on drugs. He had also taught pharmacology in medical schools. Dr. Laird had sufficient expert knowledge to render opinions on the authoritativeness of the PDR, the standard of care, and causation with respect to prescribing oral contraceptives. Allowing his testimony was not reversible error.

Defendant also suggests that the testimony of both Dr. Laird and Dr. Immesoete was improperly admitted because it was based on the PDR. In fact, the experts did not testify that they relied solely on the PDR. Moreover, as this court held in *Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 417, the manufacturer's "warning of the hazards accompanying [a drug's]

improper administration provide[s] the proof of the proper professional standards which would ordinarily be shown by expert medical testimony."

The defendant apparently asks us to hold as a matter of law that once the United States Food and Drug Administration declares a drug safe, whether or not a physician prescribes it for a patient is purely a matter of professional judgment, and hence he should be insulated from malpractice liability. We decline that invitation. While a doctor must of course exercise professional judgment, his judgment may itself deviate from the standard of care, and that is precisely how the defendant here is alleged to have erred.

Next, the defendant maintains that the jury's finding on negligence was against the manifest weight of the evidence. Defendant points to various authorities asserting that there is an unresolved controversy in the medical community as to the relationship between estrogen and thrombophlebitis, the fact that the number of patients in the studies relied upon by the defendant's expert overshadows the number in the studies used by the plaintiff's experts and the PDR, and that various other physicians who treated Betty Witherell did not advise her to discontinue her use of estrogens. Even if correct, none of these considerations demonstrate that the jury's verdict was unsupported by the evidence. The plaintiff produced substantial testimony to the effect that the defendant did depart from the standard of care, and the fact that conflicting evidence was adduced by the defendant is simply not a basis for reversal. *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 424.

## B. CAUSATION

One of the reasons given by the appellate court for reversal was that the instructions did not require the jury "to make a finding that the prescription of estrogen

and birth-control pills were [*sic*] the proximate cause of her injury or that her problems were aggravated by the medication." (148 Ill. App. 3d 32, 39.) Without such a provision, the appellate court stated, the issues instruction amounted to an admission of liability on the part of the defendant.

The appellate court erred in reversing on this ground. A causation instruction restricted to the defendant's prescription of estrogens would have been unjustifiably limited since the plaintiff also relied on other asserted acts of negligence, including the failure to prescribe anticoagulants. In fact, the jury was correctly advised that it must find the defendant's negligence caused the plaintiff's injuries. Plaintiff's instruction No. 19, given by the trial court, stated that the plaintiff had the burden of proving that the defendant's negligence proximately caused the plaintiff's injuries. In addition, the jury was advised in the issues instruction that the plaintiff maintained (and the defendant denied) that the specified grounds of negligence, including the failure to diagnose, failure to prescribe appropriate drugs, and continued prescription of estrogens, proximately caused the injuries. The verdict form signed by the jury stated that the plaintiff's injuries proximately resulted from the defendant's negligence. Taken as a whole, the instructions sufficiently informed the jury of the causation requirement.

The defendant also advances objections to the jury's finding of causation. He first asserts that the trial record is bare of any testimony showing that the defendant's negligence was more probably than not the cause of the plaintiff's injuries. Defendant's complaint is seemingly directed to the form of the questions propounded to the plaintiff's expert witnesses. The defendant apparently believes that the only proper questions for the experts were whether the defendant's breach of the standard of

care "proximately caused" the injury or whether it was "more probably true than not" that the negligence caused the injury. We cannot agree. The term "proximate" refers to a legal standard, not a medical one, and even if the expert physician could make sense of the question (see *Russell v. Subbiah* (1986), 149 Ill. App. 3d 268, 274 (Barry, J., dissenting)), the jury would certainly have no idea what the testimony meant (at least until it was instructed on proximate causation). Neither would there have been any virtue in asking the experts whether it was more probably true than not that the negligence caused the injuries. Defendant again confuses the issue to be resolved by the jury with the questions to be asked of the expert witness. Despite some variation in the form of the causation questions, Dr. Immesoete essentially testified that to a reasonable degree of medical certainty the defendant's negligence caused or contributed to the injuries. An expert opinion held to a reasonable degree of medical certainty obviously furnishes an adequate basis for a jury's finding that causation was proved by a preponderance of the evidence. See *People v. Brackett* (1987), 117 Ill. 2d 170 (opinion to a reasonable degree of medical certainty sufficient to establish causation in a criminal proceeding).

Also without merit is the contention that the jury's conclusion on causation was against the manifest weight of the evidence. Although the question of causation was hotly disputed, the jury heard all the testimony, and this court has no basis for disturbing its finding for the plaintiff. A disagreement among medical authorities as to cause-and-effect relationship does not preclude a verdict for the plaintiff. (*Klink v G. D. Searle & Co.* (1980), 26 Wash. App. 951, 614 P.2d 701 (relationship between birth control pill and stroke).) We note that the defendant's briefs address only the question of whether there was sufficient evidence that the estrogen therapy caused the

plaintiff's condition. Dr. Immesoete also testified, though, that the failure to provide anticoagulation therapy also contributed, and the defendant makes no attempt to show that a verdict reached on this basis would be against the manifest weight.

### III. OTHER ISSUES

The defendant raises an additional two dozen evidentiary rulings and instructions for our consideration. We have examined each contention and agree with the dissenting justice in the appellate court that they are "either without merit or amount to such a minor matter as to not constitute reversible error." (148 Ill. App. 3d 32, 47 (Barry, J., dissenting).) Nothing in the defendant's case persuades us that a new trial is required. We therefore turn to the plaintiff's contention that the award should not have been reduced for her comparative negligence and the appellate court's disposition of that argument.

### IV. COMPARATIVE NEGLIGENCE

In her cross-appeal in the appellate court, the plaintiff sought to have the $200,000 reduction of her damages for her own negligence set aside. She argued there, and reiterates in this court, that her negligence was not properly in issue because defendant did not plead it as an affirmative defense and she therefore had no opportunity to rebut the evidence which formed the basis for the comparative negligence instruction. The appellate court held, however, that another error in the comparative negligence instruction—which was not raised by either party—required reversal not only of the finding of comparative negligence, but of the entire verdict.

The appellate court's ruling was based on *Casey v. Baseden* (1986), 111 Ill. 2d 341. *Casey* rejected the longstanding principle in Illinois that a plaintiff had the bur-

den of proving his own freedom from contributory negligence and ratified a jury instruction placing the burden of proving the plaintiff's negligence on the defendant. *Casey*, though, furnishes no reason for reversing the verdict on comparative negligence. The plaintiff, the party who would presumably be prejudiced by the absence of such an instruction, did not and does not complain that it was not given. Even more anomalous is the appellate court's reliance on a supposed error harmful only to the plaintiff's interests as a reason for ruling in favor of the defendant—reversing the plaintiff's award of $300,000 damages and ordering a new trial. We do not think the parties were deprived of a fair trial by the trial court's failure to anticipate *Casey* and to instruct the jury that the defendant had the burden of proving the plaintiff's comparative negligence.

Concerning the claims actually raised by the plaintiff, we find no error warranting reversal of the finding that 40% of her injury was due to her own negligence. It is true that the defendant did not plead the plaintiff's comparative fault, but this is unsurprising since nothing required him to do so prior to an amendment to section 2—613(d) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—613(d)) which became effective only after the trial in this case. (See Pub. Act 84—624, eff. Sept. 20, 1985.) The plaintiff also complains of the trial court's issues instruction, which advised the jury of seven grounds upon which a finding of comparative negligence could be based, including her alleged refilling of prescriptions without her physicians' approval, taking medicine too frequently, insufficient physical activity, refusal to reduce her medication regimen, long automobile trips despite her doctors' warnings, and failure to report continuous leg pain from 1963 through 1967. Evidence was presented that would support a finding by the jury that plaintiff had committed some or all of these de-

faults. For instance, it is undisputed that immobility and inactivity can cause thrombophlebitis. Dr. Weimer testified that he believed the plaintiff's ailment was due to prolonged periods of immobility from long car trips and had warned her against them. Her hospitalization in 1972 immediately followed such a trip, and the jury could infer that it contributed to her thrombophlebitis. Plaintiff herself testified to her general lack of activity. Although there was no formal procedural requirement that the plaintiff be notified of the specific facts that would be relied upon by the defendant, we believe she was adequately apprised of the defendant's main points and had ample opportunity to rebut them.

## V. CONCLUSION

In summary, the appellate court erred in both of the reasons it offered for reversing and requiring a new trial. The jury's verdict was supported by the evidence, and we find no reason for overturning it. However, the trial judge did err in holding section 2–1205 of the Code of Civil Procedure unconstitutional. For these reasons, the judgment of the appellate court is reversed, the judgment of the circuit court is reversed insofar as it struck down the collateral source statute, and is affirmed in all other respects, and the cause is remanded to the circuit court of Tazewell County with directions to deduct the sum of $41,052.77 from the plaintiff's award.

*Appellate court reversed;*
*circuit court affirmed in part*
*and reversed in part; cause*
*remanded with directions.*

RYAN and CUNNINGHAM, JJ., took no part in the consideration or decision of this case.