FOURTH DIVISION
 FILED: 10/24/96

No. 1-96-0245

PETER MOORE, ) APPEAL FROM THE
 ) CIRCUIT COURT OF
 Plaintiff-Appellee, ) COOK COUNTY
 )
 v. )
 )
ANCHOR ORGANIZATION FOR HEALTH )
MAINTENANCE and JAMES C. RORIG, M.D., ) HONORABLE
 ) MICHAEL J. GALLAGHER,
 Defendants-Appellants. ) JUDGE PRESIDING.

 PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:
 The plaintiff, Peter Moore, filed the instant medical
negligence action against the defendants, Dr. James C. Rorig and
Anchor Organization for Health Maintenance (Anchor). The matter
was tried before a jury resulting in a verdict against both
defendants in the sum of $6,404,952. The trial court entered
judgment on the verdict and, thereafter, denied the defendants'
post-trial motions. The defendants have appealed, contending the
trial court erred in failing to enter a judgment notwithstanding
the verdict by reason of the plaintiff's failure to prove that any
negligence on their part was a proximate cause of his claimed
injuries. Alternatively, the defendants argue their entitlement to
a new trial on the grounds that: 1) the jury's verdict was against
the manifest weight of the evidence; 2) the trial court erred in
permitting the plaintiff to introduce evidence of his prior
statements which were consistent with his trial testimony; 3) the
court abused its discretion by permitting the cumulative testimony
of five expert witnesses called by the plaintiff; and 4) the court
erred in failing to grant the defendants' motion for a mistrial
after the plaintiff elicited irrelevant testimony relating to
Anchor's policies. For the reasons which follow, we reverse the
judgment entered in this action, and remand the cause to the
circuit court for a new trial. 
 For a long period prior to the events giving rise to this
litigation, the plaintiff suffered from severe ankylosing
spondylitis, a progressive, degenerative disease of the spine and
joints which destroys cartilage and causes bones to fuse together. 
In order to correct the effects of his condition, the plaintiff
underwent hip replacement surgery in 1984 and a spinal fusion in
1986. Both surgeries were successful and the plaintiff was
ambulatory in 1988. 
 On March 30, 1989, the plaintiff was diagnosed as having an
arachnoid cyst in his spinal canal which was crushing his spinal
cord. Surgery to remove the cyst was performed on April 4, 1989,
by Dr. Kelvin Von Roenn. According to Von Roenn, the surgery to
remove the cyst was performed too late as the plaintiff's spinal
cord already had been crushed. As a result of his spinal cord
having been compressed by the cyst, the plaintiff can no longer
walk independently and is essentially a paraplegic. 
 The plaintiff filed the instant action against Rorig, his
primary care physician, and Rorig's employer, Anchor, charging, 
inter alia, that Rorig was negligent in: 1) failing to examine the
plaintiff in November and December 1988; 2) failing to recognize
that the plaintiff might have been suffering from a central nervous
system disorder; and 3) failing to refer the plaintiff to a
neurologist. The plaintiff maintained that during the course of a
regularly scheduled appointment with Rorig on November 11, 1988, he
complained of difficulty in sleeping due to muscle spasms in both
legs and pain in his joints. According to the plaintiff, Rorig did
not examine him; instead, Rorig attributed the plaintiff's insomnia
to stress, advised him to stop drinking coffee, and scheduled a
follow-up appointment for December 29, 1988. 
 The plaintiff testified that on December 29, 1988, he told
Rorig that his leg spasms had gotten worse after his November 11
appointment. Rorig prescribed a sedative, but again did not
examine the plaintiff or refer him to a neurologist. 
 The plaintiff was out of the country on business from January
8 to January 17, 1989. During that trip, the plaintiff's leg
spasms worsened to a point where his entire leg would move. 
Additionally, he began to experience the spasms during the day as
well as at night. The plaintiff testified that when he returned
from his trip he attempted to call Rorig on several occasions to
complain of the spasms. According to the plaintiff, he reached
Rorig by phone on January 25, 1989, and informed him that the
spasms were getting worse. After noting that the plaintiff was
scheduled to see his rheumatologist, Dr. Bruce McLeod, the
following day, Rorig told the plaintiff that McLeod could prescribe
any additional medication that might be necessary.
 McLeod's notes of the plaintiff's January 26, 1989, ap-
pointment reflect that the plaintiff's chief complaint was of
muscle spasms in his legs with intermittent quivering which
prevented him from sleeping. McLeod did not perform a complete
neurological examination of the plaintiff, but he did prescribe a
muscle relaxant.
 The plaintiff testified that his spasms continued to get worse
subsequent to his appointment with McLeod. After making several
calls to Anchor, the plaintiff was given a March 7, 1989, ap-
pointment with Rorig. When the plaintiff saw Rorig on March 7, he
complained of muscle spasms. Rorig noted the plaintiff's
complaints and reviewed the notes from the plaintiff's appointment
with McLeod. Although Rorig did not examine the plaintiff on March
7, he suspected that the plaintiff had a serious disorder of the
central nervous system. Based on that suspicion, Rorig referred
the plaintiff to a neurologist and ordered several tests of the
plaintiff's peripheral nervous system. 
 On March 20, 1989, Dr. Sylvan Junger, the neurologist to whom
the plaintiff was referred, performed the peripheral nervous system
tests ordered by Rorig. During the course of his appointment with
Junger, the plaintiff reported that he had been experiencing leg
spasms since November 1988. Junger testified that, although the
plaintiff's peripheral nervous system tests were negative, he found
significant central nervous system involvement. On that same day,
Junger informed Rorig of his findings and recommended further
testing. 
 On March 27, 1989, the plaintiff was admitted to the hospital
and underwent a series of tests which resulted in the March 30
diagnosis of an arachnoid cyst in his spinal canal and the April 4
surgery to remove the cyst. The records of the plaintiff's
hospitalization contain a number of references to the plaintiff
having experienced leg spasms since November 1988.
 Anchor admitted the agency relationship between it and Rorig,
but both defendants denied that Rorig was negligent in his
treatment of the plaintiff. Rorig admitted that he did not examine
the plaintiff during his visits on November 11 and December 29,
1988, but denied that the plaintiff ever complained of leg spasms
during either visit. And, although he had no recollection of
speaking to the plaintiff in January 1989, Rorig denied that the
plaintiff ever complained of leg spasms during the course of a
phone conversation. According to Rorig, the plaintiff first
informed him of his leg spasms on March 7, 1989.
 At trial, each of the parties produced a number of physician-
witnesses who testified regarding the propriety of Rorig's
treatment of the plaintiff. The plaintiff elicited expert medical
testimony that Rorig breached the applicable standard of care by
failing to perform neurological examinations in November and
December 1988 and by failing to refer the plaintiff to a
neurologist at that time. A fair reading of the record reveals
that the plaintiff's experts based their opinions in this regard,
in part, upon the premise that the plaintiff complained of leg or
muscle spasms when he saw Rorig in November and December of 1988. 
Junger, testifying for the plaintiff, conceded, however, that if
Rorig was not informed of the plaintiff's leg spasms until March
1989, his treatment of the plaintiff complied with the applicable
standard of care. Not surprisingly, the defendants' expert medical
witnesses testified that Rorig's treatment of the plaintiff was
appropriate, premised upon the assumption that Rorig was first
advised of the plaintiff's leg spasms on March 7, 1989. 
 The plaintiff introduced the testimony of several medical
witnesses going to the proximate causal relationship between
Rorig's alleged negligence and the plaintiff's ultimate paralysis. 
For their part, the defendants introduced medical testimony of a
lack of any such relationship. 
 In support of their argument for reversal and the entry of a
judgment notwithstanding the verdict, the defendants contend that
the plaintiff failed to introduce any evidence establishing "that
it was more probable that earlier diagnosis of the plaintiff's cyst
would have prevented his injury." The defendants argue that the
causation opinions rendered by the plaintiff's experts were based
upon the erroneous assumption that surgery to remove the
plaintiff's cyst, if performed at some earlier date, would have
cured the cyst, prevented its reoccurrence, and, thus, prevented
the plaintiff's ultimate paralysis. Bolstered by the testimony of
their own expert, Dr. Marshall Matz, to the effect that surgery to
remove an arachnoid cyst cannot change the course of the disease,
the defendants conclude that the causation opinions of the
plaintiff's experts were mere conjecture and insufficient to
satisfy the plaintiff's burden of establishing proximate cause. We
disagree. 
 The standard to be employed in entering judgments non obstante
verdicto (n.o.v.) is well settled. "[J]udgments n.o.v. [should be]
entered only in those cases in which all of the evidence, when
viewed in its aspect most favorable to the opponent, so
overwhelmingly favors movant that no contrary verdict based on that
evidence could ever stand." Pedrick v. Peoria & Eastern R.R. Co.,
37 Ill.2d 494, 510, 229 N.E.2d 504 (1967). It is by this standard
that a trial court must rule on such a motion, and it is also by
this standard that we must judge the propriety of the trial court's
action in that regard. 
 Guided by the admonition of the Pedrick court, we have
examined the evidence introduced upon the trial of this cause and
find that the plaintiff satisfied the burden of establishing the
proximate cause element of his action by eliciting testimony from
his expert medical witnesses that Rorig's negligence proximately
resulted in the plaintiff's present condition of paralysis. 
Specifically, Dr. Nachman Brautbar and Junger both opined, "within
a reasonable degree of medical certainty", that the plaintiff's
condition of paraplegia was causally related to Rorig's failure to
examine the plaintiff and refer him to a neurologist prior to March
7, 1989. Contrary to the opinions expressed by Matz, Von Roenn
testified that surgery of the type performed on the plaintiff in
April 1989 halts the progression of the symptoms suffered by the
plaintiff, including the loss of sensation leading to paraplegia. 
When asked to render an opinion within a reasonable degree of
medical certainty as to the effect of a failure to examine the
plaintiff and refer him to a neurologist in November and December
1988, Junger stated: "It's a difference between him being able to
walk today and not being able to walk today." In explaining his
opinion, Junger testified that examination and referral in December
1988 would have revealed a problem in the nervous system leading to
surgery, "and then at that point the progression would have been
halted *** and [the plaintiff] would have *** remained ambulatory." 
 As an alternative, the defendants claim they are entitled to
a new trial as the jury's finding on the issue of proximate cause
is against the manifest weight of the evidence. Again, we
disagree. 
 Verdicts are set aside and new trials ordered when the verdict
of the jury is against the manifest weight of the evidence. 
Mizowek v. DeFranco, 64 Ill. 2d 303, 356 N.E.2d 32 (1976). In
order to be against the manifest weight of the evidence, conclu-
sions opposite those reached by the trier of fact must be clearly
evident, plain and indisputable. In re Estate of Lukas, 155 Ill.
App. 3d 512, 508 N.E.2d 368 (1987). However, it is the function of
the jury to weigh contradictory evidence, judge the credibility of
witnesses, and draw ultimate conclusions as to the facts of a case. 
Consequently, a reviewing court is not at liberty to substitute its
judgment for that of the trier of fact merely because different
conclusions might be drawn from the evidence presented at trial. 
Finley v. New York Central R.R. Co., 19 Ill. 2d 428, 167 N.E.2d 212
(1960). 
 Our reading of the record demonstrates nothing more than
contradictory evidence offered by the parties on the question of
proximate cause. The jury resolved the issue in favor of the
plaintiff, and the record simply fails to demonstrate that an
opposite conclusion is clearly evident and indisputably warranted. 
 The remaining assignments of error claimed by the defendants
in support of their request for a new trial all surround
evidentiary rulings made by the trial court. Our analysis of these
issues is grounded in an acknowledgement that determinations as to
the relevance and admissibility of evidence are committed to the
sound discretion of the trial court, and its decisions as to these
matters will not be reversed absent a clear abuse of that
discretion resulting in manifest prejudice to a party. People v.
Hayes, 139 Ill. 2d 89, 130, 564 N.E.2d 803 (1990). 
 The defendants claim that the trial court abused its dis-
cretion by permitting the plaintiff to call five physicians to
render cumulative testimony on the question of whether Rorig
breached the standard of care in his treatment of the plaintiff. 
Additionally, they claim that three of these physicians, Dr. Terry
Nicola, Dr. Paul Schlesinger and Junger, lacked the necessary
qualifications to render opinion testimony on the issue as they did
not practice internal medicine, Rorig's field of medical specialty. 
 On the issue of the qualifications of Nicola, Schlesinger and
Junger to render opinion testimony on the standard of care, suffice
it to say that: 1) all three are licensed physicians, as is Rorig
(see Purtill v. Hess, 111 Ill. 2d 229, 489 N.E.2d 867 (1986); Dolan
v. Galluzzo, 77 Ill. 2d 279, 396 N.E.2d 13 (1979)); 2) Schlesinger
is board-certified in internal medicine, as is Rorig; and 3)
although not internists, Nicola and Junger testified to their
knowledge of the standard of care owed by a medical doctor
generally and based their opinions on Rorig's breach of that
standard (see Witherell v. Weimer, 118 Ill. 2d 321, 515 N.E.2d 68
(1987)). We, therefore, find no merit in the defendants' challenge
to their qualifications. 
 The defendants acknowledge that the admission of cumulative
evidence is a matter within the discretion of the trial court. 
Simmons v. City of Chicago, 118 Ill. App. 3d 676, 455 N.E.2d 232
(1983). Nevertheless, they maintain that the court abused its
discretion by permitting five physicians to testify as to Rorig's
breach of the standard of care. The defendants do not contend, nor
could they, that the testimony offered by these witnesses was
irrelevant or of minimal probative value. The medical evidence in
this case was complicated by the plaintiff's extensive medical
history and the uncommon nature of the cyst which formed in his
spinal canal. The plaintiff was entitled to develop his case
through relevant evidence, and we cannot say that the trial court
abused its discretion in permitting the plaintiff to elicit
standard of care opinions from five physicians, four of whom had
rendered medical treatment to the plaintiff.
 Next, the defendants contend that the trial court erred in
failing to grant their motion for a mistrial after Junger,
testifying for the plaintiff, intimated that Anchor's approval
policies caused a seven day delay in the performance of an MRI test
on the plaintiff. They argue that, since Anchor admitted its
agency relationship with Rorig rendering it liable for any
negligence on his part, evidence of Anchor's alleged negligence,
absent proof that its acts or omissions independently caused injury
to the plaintiff, was irrelevant and highly prejudicial. See Neff
v. Davenport Packing Co., 131 Ill. App. 2d 791, 268 N.E.2d 574
(1971). We, however, find no basis to support the defendants'
claim that the trial court erred in failing to declare a mistrial. 
 As the defendants admit in their brief, when Junger attributed
the seven day delay to Anchor's approval policies, the trial court
sustained the defendants' objection and, after denying their motion
for a mistrial, instructed the jury that the plaintiff was not
claiming that the delay was inappropriate or that it caused him any
harm. Consequently, absent clear evidence to the contrary, we
presume that the jury followed the court's instruction to disregard
the testimony thereby eliminating any potential prejudice to the
defendants. Garcia v. City of Chicago, 229 Ill. App. 3d 315, 593
N.E.2d 855 (1992). Further, as the plaintiff correctly points out,
it was the defendants' cross-examination of Brautbar, the first
witness to testify in the case, that introduced the notion of a
possible impropriety surrounding the seven day delay between the
time the plaintiff saw Junger on March 7, 1989, and the performance
of the MRI on March 27, 1989. Specifically, the defendants
attempted to elicit testimony from Brautbar that Junger failed to
order the test done on an emergency basis. 
 The last issue for consideration in this appeal is the
defendants' claim that the trial court erred in permitting the
plaintiff to introduce evidence of his own out-of-court statements
which were consistent with his trial testimony. 
 Prior to the commencement of trial, the defendants filed
several motions in limine seeking an order barring the plaintiff
from introducing any evidence as to conversations he might have had
with friends about his medical condition or treatment. The trial
court denied the motions. After the trial commenced, but before
any such testimony was introduced, the defendants again moved to
bar the introduction of any evidence relating to the plaintiff's
conversations with his friends and family, and again the motion was
denied. The parties then stipulated to the defendants' continuing
objection to any testimony regarding "prior consistent statements
and *** relating to Mr. Moore's statements to friends or family
members or whomever relating to his muscle spasms and complaints of
muscle spasms in as early as November of '88 or October of '88." 
Immediately after the stipulation, the plaintiff called three of
his friends to testify about conversations they had with the
plaintiff regarding his medical condition. 
 Penelope Springall testified that she had several conversa-
tions with the plaintiff between January 8 and 17, 1989, during
which the plaintiff complained of leg spasms. According to
Springall, the plaintiff stated that he had been experiencing leg
twitches and had seen his doctor several times. The plaintiff told
her that his doctor said the condition was stress-related, but the
plaintiff was not convinced of the explanation.
 Joan Wallace testified to a conversation in September or
October of 1988, during which the plaintiff mentioned that he was
having leg spasms. She also testified to a telephone conversation
with the plaintiff in mid-January 1989, during which the plaintiff
told her that his leg spasms were getting worse. 
 After Wallace testified, the defendants moved for a mistrial,
which the court denied. The plaintiff then called Jean Maunder to
testify. Maunder related the substance of three particular
conversations with the plaintiff. In testifying to a conversation
which occurred in November 1988, she stated: 
 "I recall that he told me he was experiencing spasms
 of his legs. He described them as jerky movements of
 both of his legs that would awaken him at night and he
 told me he was planning to see his doctor related to
 these spasms, to see Dr. Rorig." 
 According to Maunder, she had another conversation with the
plaintiff several days thereafter, and the plaintiff told her that
"he had seen Dr. Rorig for his leg spasms and that Dr. Rorig's
impression was that they were probably stress related." Last, she
testified to a conversation in January 1989, during which the
plaintiff told her "that his leg spasms were worse since he had
made his trip, that he was having them more frequently than what he
had had before[,] and that he had called to try and speak with Dr.
Rorig."
 Our resolution of this final issue requires a determination of
whether the testimony of Springall, Wallace and Maunder as to their
conversations with the plaintiff constitutes inadmissible hearsay;
and, if it does, whether the admission of that testimony requires
us to reverse the judgment in this case and remand the matter for
a new trial. 
 Illinois has long subscribed to the general rule that proof of
a witness's out-of-court statements are inadmissible when offered
solely to corroborate his in-court testimony on the same subject. 
Waller v. People, 209 Ill. 284, 287, 70 N.E. 681 (1904); Stolp v.
Blair, 68 Ill. 541 (1873); see also People v. Clark, 52 Ill. 2d
374, 288 N.E.2d 363 (1972). The reason for the rule is evident:
"The improper bolstering of a witness' credibility through the use
of prior consistent statements preys on the human failing of
placing belief in that which is most often repeated." People v.
West, 263 Ill. App. 3d 1041, 1047, 636 N.E.2d 948 (1994). 
Addressing this very issue, Wigmore on Evidence states:
 "A former consistent statement helps in no respect
 to remove such discredit as may arise from a contra-
 diction by other witnesses. When B is produced to swear
 to the contrary of what A has asserted on the stand, it
 cannot help us, in deciding between them, to know that A
 has asserted the same thing many times previously. If
 that were an argument, then the witness who had repeated
 his story to the greatest number of people would be the
 most credible." 4 Wigmore, Evidence 1127 (Chadbourn
 rev. 1972). 
 But, as noted in People v. Harris, 123 Ill. 2d 113, 139-40, 526
N.E.2d 335 (1988):
 "A narrow exception to this rule has been created where
 it is charged that the testimony is recently fabricated
 or that the witness has some motive for testifying
 falsely. Then a prior consistent statement may be
 admitted, but only if made before the motive to fabricate
 arose. [Citations.] In such an instance, proof that the
 witness gave a similar account of the occurrence, when
 the motive to lie was nonexistent, or before the effect
 of the account could be foreseen, makes the prior
 consistent statement admissible. [Citation.]" 
 As the plaintiff correctly argues, a charge of recent
fabrication or motive to testify falsely need not be explicit in
order to satisfy the first prerequisite to the introduction of
prior consistent statement evidence. Even the suggestion of recent
fabrication or motive to lie is sufficient. People v. Henderson,
142 Ill. 2d 258, 310, 568 N.E.2d 1234 (1990). According to the
plaintiff, the defendants implied that his assertion of having
complained of leg spasms to Rorig in November and December 1988,
and by phone in January 1989, was a fabrication. The plaintiff
supports his contention in this regard with statements of the trial
court describing the defendants' opening statement as a clear
charge of fabrication. And, since the testimony of Springall,
Wallace and Maunder was restricted to statements made by the
plaintiff prior to his having been diagnosed as suffering from a
cyst in the spinal canal, that is, before he had any motive to
fabricate, the plaintiff argues that the trial court properly
admitted the testimony as falling under the exception articulated
by the court in Harris. 
 The statements of the trial court notwithstanding, our
examination of the defendants' opening statement fails to reveal
any charge of fabrication, either explicit or implicit. The
plaintiff can only direct this court to those portions of the
defendants' opening statement where the jury was informed that,
contrary to the plaintiff's version of events, Rorig would testify
that the plaintiff never informed him in November and December 1988
that he was experiencing leg or muscle spasms. The plaintiff seems
to argue to this court, as he did before the trial court, that the
introduction of contradictory evidence implies fabrication. The
trial court seemed to be of the opinion that the mere fact that
Rorig would testify contrary to the plaintiff's version of events
satisfied the first prerequisite for the admission of the
plaintiff's prior consistent statements. Our conclusion in this
regard is supported by the trial court's own reasoning. When the
defendants moved to bar this type of evidence immediately prior to
Springall's testimony, the court stated:
 "I think this is -- I'm taking this as a motion to
 reconsider, and I'm going to deny the motion. You made
 your record certainly, but I think there is too fine a
 point trying to be made here. You're basically saying
 Dr. Moore never told Dr. Rorig about this. It doesn't
 matter whether you call it wrong, mistaken, lying,
 inaccurate, however you describe it. You're saying he
 never said that. We disagree that he ever said that.
 And they're entitled to say he did -- here is
 evidence to show that he contemporaneously with that
 saying (sic) to other people this is what my complaints
 were. I'm going to let the jury give it weight." 
 We know of no case which stands for the proposition that the
mere introduction of contradictory evidence constitutes, without
more, an implied charge of fabrication. In fact, the contrary is
true. See Stolp, 68 Ill. at 544-45; West, 263 Ill. App. 3d 1041;
Johnson v. Plodzien, 31 Ill. App. 2d 222, 228-29, 175 N.E.2d 560
(1961). Our research reveals that the cases cited by the plaintiff
sanctioning the admission of evidence of prior consistent
statements have one of two common factual denominators: either an
explicit charge of fabrication had been made by the opposing party
prior to the introduction of a witness's prior consistent statement
(see People v. Titone, 115 Ill. 2d 413, 505 N.E.2d 300 (1986); 
Ashford v. Ziemann, 99 Ill. 2d 353, 459 N.E.2d 940 (1984)), or the
witness's motive to testify falsely was implied by the opponent's
reference to facts extrinsic to the cause on trial (see People v.
Williams, 147 Ill. 2d 173, 588 N.E.2d 983 (1991); Harris, 123 Ill.
2d 113; People v. Shum, 117 Ill. 2d 317, 512 N.E.2d 1183 (1987); 
Gates v. People, 14 Ill. 433 (1853); People v. Askew, 273 Ill. App.
3d 798, 652 N.E.2d 1041 (1995)). Neither circumstance is present
in the instant case. Further, contrary to the trial court's
understanding, evidence of prior consistent statements is not
admissible merely to rebut a charge or inference of mistake or
inaccuracy. See Hayes, 139 Ill. 2d at 138.
 In this case, the plaintiff's prior consistent statements were
hearsay and did not fall within any recognized exception to the
general rule against their admission into evidence. Consequently,
we find that the trial court erred in permitting Springall, Wallace
and Maunder to testify to their conversations with the plaintiff
and, in particular, to the plaintiff's statements regarding his
medical condition, his complaints to Rorig, and the treatment that
he received for that condition.
 Not every erroneous admission of a prior consistent statement
constitutes reversible error. The prejudicial nature of the
evidence must be judged on a case-by-case basis. Henderson, 142
Ill. 2d at 311. When, however, evidence of a prior consistent
statement is highly prejudicial because it makes the testimony of
a witness more believable on a critical fact in controversy and it
is impossible to tell whether the jury relied upon that evidence,
the statement's erroneous admission warrants reversal of the jury's
verdict and an order remanding the case for a new trial. See
People v. Smith, 139 Ill. App. 3d 21, 486 N.E.2d 1347 (1985). 
 Because we find that the trial court erred in admitting
evidence of the plaintiff's prior consistent statements and also
find that those statements were introduced solely to bolster the
plaintiff's in-court testimony on a critical fact in controversy,
we reverse the judgment entered against the defendants and remand
this case to the circuit court for a new trial. 
 Reversed and remanded.
 THEIS and O'BRIEN, JJ., concur.