# Illinois Official Reports

## Appellate Court

---

### *Lorenz v. Pledge*, 2014 IL App (3d) 130137

---

| | |
|---|---|
| Appellate Court Caption | MARK LORENZ, GARY LORENZ, and LESLIE LORENZ, Plaintiffs, v. THOMAS PLEDGE and THE McDONOUGH COUNTY SHERIFF'S DEPARTMENT, Defendants-Appellees (Brian Dayton, Individually and as the Special Administrator of the Estate of Jill D. Dayton, Deceased, and Amanda Dayton Nehring, Plaintiffs-Appellants). |
| District & No. | Third District<br>Docket No. 3-13-0137 |
| Filed<br>Modified upon<br>denial of rehearing | February 5, 2014<br><br>June 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a wrongful death and personal injury action arising from a collision that occurred when a vehicle driven by one of the plaintiffs made a left turn in front of a sheriff's squad car engaged in a chase, the verdict for the sheriff's department and the deputy was reversed and the cause was remanded for a new trial on the ground that the trial court erred in admitting the line-of-sight video submitted by defendants, since the conditions existing at the time of the video were not the same as those when the accident occurred and there existed significant differences in the details of the video and the facts at trial, and although the defense informed the jury that the video was not a re-creation of the crash, the requirements for the admission of demonstrative evidence were not met and plaintiffs were prejudiced; furthermore, the limiting instruction given about the video was confusing and improper and did not track the applicable pattern instruction. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of McDonough County, No. 06-L-9; the Hon. Richard H. Gambrell, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | John M. Spesia (argued), Kent Slater, and Jacob Gancarczyk, all of Spesia, Ayers & Ardaugh, of Joliet, for appellants.<br><br>Craig L. Unrath (argued), of Heyl, Royster, Voelker & Allen, of Peoria, and Matthew R. Booker and Douglass R. Bitner, of Heyl, Royster, Voelker & Allen, of Springfield, for appellees. |
| Panel | JUSTICE O'BRIEN delivered the judgment of the court, with opinion.<br>Justice Carter concurred in the judgment and opinion.<br>Justice Schmidt concurred in part and dissented in part upon denial of rehearing, with opinion. |

**OPINION**

¶ 1      Plaintiffs Brian Dayton, individually and as special administrator of the estate of Jill Dayton, deceased, Amanda Dayton Nehring, and others not involved in this appeal, filed personal injury and wrongful death actions against defendants Thomas Pledge and the McDonough County sheriff's department, for damages they sustained following a car accident between the Daytons' minivan and a sheriff's squad car. Following a trial, the jury entered a verdict in favor of Pledge and the sheriff's department. The Daytons appealed. We reverse and remand for a new trial.

¶ 2                                    FACTS

¶ 3     On September 3, 2004, at approximately 11:30 p.m., defendant McDonough County sheriff's department received a call regarding an erratically driven sport utility vehicle (SUV). Defendant Deputy Thomas Pledge, who responded to the call, located and observed the SUV. His squad video activated, and after seeing the SUV swerve several times, Pledge effectuated a traffic stop. As Pledge approached the stopped SUV, it sped away, and he pursued the vehicle. The SUV and Pledge proceeded southbound on Route 67, heading into Macomb. Pledge's vehicle reached speeds as high as 110 miles per hour and was traveling at

100 miles per hour approximately four seconds before he entered the intersection of Route 67 and University Drive. The SUV turned off its headlights as it neared the intersection.

¶ 4    At the same time the SUV and Pledge were speeding toward the intersection, a minivan traveling northbound on Route 67 and occupied by 16-year-old Amanda Dayton, the driver; her mother, Jill Dayton, in the passenger seat; and their friend, Mark Lorenz, in the backseat, entered the intersection's center turn lane to proceed left onto University Drive. The SUV passed through the intersection, and as Amanda began the left turn, the squad entered the intersection and struck the minivan on the passenger side. Pledge, Amanda and Lorenz were injured, and Jill was killed in the accident.

¶ 5    Plaintiffs Mark Lorenz, Gary Lorenz, Leslie Lorenz (collectively, the Lorenzes), Brian Dayton, individually and as special administrator of the estate of Jill Dayton, and Amanda Dayton Nehring (collectively, the Daytons) sought to recover damages for their injuries from Pledge, individually and as a McDonough County deputy sheriff, and the McDonough County sheriff's department (collectively, the McDonough County defendants). The Lorenzes are not part of this appeal. The fourth amended complaint asserted wrongful death and bodily injury against Pledge and the sheriff's department. The complaint alleged that Pledge acted both negligently, and willfully and wantonly, and violated provisions of several statutes and the sheriff's department pursuit policy.

¶ 6    Both parties filed motions *in limine*. The Daytons sought to preclude a videotape prepared by a defense expert witness, Michael O'Hern. The video portrays a visibility or line-of-sight study undertaken by O'Hern and designed to give an indication of the line of sight down Route 67 that Amanda would have had from the left-turn lane. The Daytons argued that the video was an enactment of the crash and its probative value was outweighed by its prejudicial effect. Following a hearing, the trial court denied the motion *in limine*. The McDonough County defendants filed a motion for summary judgment, arguing that additional negligence counts the Daytons added in their fourth amended complaint were barred by tort immunity. The new counts alleged that Pledge was not executing or enforcing the law when he pursued the SUV, which the Daytons argued precluded Pledge and the sheriff's department from the protection of tort immunity. The motion was heard and denied, and the McDonough County defendants filed a motion seeking certification for an interlocutory appeal. The trial court denied the motion for certification.

¶ 7    A jury trial ensued. Testifying for the Daytons were Pledge, expert witness Robert Johnson, Amanda Dayton Nehring, and Brian Dayton. Evidence depositions of an occurrence witness and a medical doctor were read into evidence. The occurrence witness testified that she saw the accident occur and that the Dayton minivan was starting to turn left when the squad car collided with it. The squad car did not swerve or brake and its brake lights did not come on. Michael O'Hern testified as an expert witness for the defense. He created the line-of-sight video in response to an early claim by the Daytons that there were trees blocking Amanda's visibility. He undertook the experiment to determine whether there were any structures impeding Amanda's view; whether she could see Pledge's squad car; and whether it was necessary for her to yield to oncoming traffic. O'Hern reiterated a number of times that the video was not a reconstruction of the accident and explained the various differences between the conditions of the actual crash and the line-of-sight experiment, including speed, lane position, static position from the left lane, normal driving conditions, and an illuminated SUV. The conclusion O'Hern reached from the experiment was that

Amanda had a "clear line of sight of both southbound lanes of traffic" for one-half mile as observed from the left-turn lane. In addition to the video, O'Hern also based his opinion on his experience and training.

¶ 8    The Daytons timely objected to use of the video, arguing it was cumulative, inaccurate, and confusing, and that its probative value was outweighed by its prejudicial effect. The trial court overruled the objection and gave a limiting instruction to the jury as follows:

> "The witness has explained why the video was produced and you should consider it only for purposes of the consideration that the witness took of the information that's contained therein. You can consider the material for that purpose in deciding what weight, if any, you give the opinions that have been testified to by the witness."

¶ 9    Based on O'Hern's review of the squad car video, he concluded that Amanda's line of sight was blocked for one second by the passing SUV but the squad's emergency lights were still visible, and that Amanda could see the approaching squad for 13 to 15 seconds before the impact. He further opined that Pledge was traveling at 86 miles per hour entering the intersection, slowed to 73.9 miles per hour prior to impact, and to 70 miles per hour at impact. O'Hern stated that Amanda "would have a duty to yield and stop and not engage in that left turn maneuver in front of the vehicle." He opined that Amanda had a duty to yield to oncoming traffic in general, and to emergency vehicles in particular, when turning left. In O'Hern's professional opinion, Amanda's failure to yield was the cause of the accident and Pledge operated with due regard for the public's safety.

¶ 10    Pledge testified, in part, that he was aware of the license plate number of the SUV before he began to pursue the vehicle. He also heard on the police monitor that the Macomb police were placing spike strips to stop the SUV and were prepared to apprehend the driver. He anticipated that the SUV would ultimately crash and that it created a "huge safety concern" by traveling without its headlights. Pledge knew his speed reached 110 miles per hour during the pursuit. He saw the Dayton minivan in the left-turn lane but opted to proceed through the intersection in order to keep the SUV in sight. Pledge grew up in the Macomb area and was familiar with the intersection where the accident occurred and was aware that other accidents occurred there, often involving left-turning vehicles. As an officer, Pledge had responded to some of the accident scenes at the intersection. Pledge was also aware that Western Illinois University (WIU) was in session, increasing the population in the area of the intersection, which was an entrance to campus. It was a holiday weekend, which also increased pedestrian and vehicular traffic.

¶ 11    Pledge further testified regarding the sheriff's department policy regarding high speed pursuits. The policy stated that " 'fresh pursuit' at *high* speeds is justified only when the officer knows or has reasonable grounds to believe the violator has committed or attempted to commit a serious felony." (Emphasis in original.) The policy also provides that it is not inconsistent with the pursuit policy "that it is sometimes better to discontinue pursuit, than to continue pursuit and risk the consequences." The policy provides other regulations and procedures regarding "fresh pursuit," including advising that the officer must consider, "most importantly, the safety of citizens, whose protection is his major objective." The policy allows officers in pursuit to exceed the speed limit and violate other traffic regulations, but only with the squad's lights and siren employed and "[i]f the utmost safety is insured for self and others." Finally, the policy provides that an officer engaged in pursuit is not "relieved of

his duty to drive with 'due regard' for the safety of all persons, nor protected from the consequences of any reckless disregard for their safety."

¶ 12　　　Closing arguments took place. Counsel for the Daytons argued that Amanda's vehicle was only visible for five seconds before the collision as indicated in the squad video. The defense objected, to which the trial court responded, as follows:

> "The objection is that you have misstated the fact. That is, I believe that there was testimony or some sort of evidence that there was a period of five seconds within which the squad car would have been viewed, and my recollection of the evidence is that there was no such testimony from any of the occupants of the [mini]van. There was no testimony from the evidence deposition of the occurrence witness, and there was no testimony of five seconds. The only testimony that I heard was the opinion witness of the defense."

¶ 13　　　During deliberations the jury asked to see the squad car video, along with other evidence. The video was replayed for the jury. The jury returned a verdict for the McDonough County defendants and against the Daytons. The Daytons filed a posttrial motion, maintaining that the O'Hern video was improperly admitted; O'Hern improperly gave an opinion on Amanda's duty; they were prejudiced by the defense's closing argument; and the trial court failed to properly instruct the jury. The Daytons' motion was heard and denied. They appealed.

¶ 14　　　　　　　　　　　　　　　ANALYSIS

¶ 15　　　The Daytons raise four issues on appeal. They challenge the trial court's rulings on the admission of the defense's line-of-sight video; the limiting instruction concerning the video; the limitations on their closing argument; and the defense expert's testimony regarding Amanda's duty.

¶ 16　　　The first issue is whether the trial court erred in admitting the defense video. The Daytons argue that the line-of-sight video submitted by the defense was improperly admitted. They maintain the conditions shown in the video were not substantially similar to the conditions of the accident, and the video was inaccurate, misleading, and confusing, unfairly biased to the defense theory, and an informal accident reconstruction.

¶ 17　　　The general guidelines for the admission of experiments are found in Illinois Rules of Evidence 401 and 402 (Ill. R. Evid. 401, 402 (eff. Jan. 1, 2011)) regarding relevant and irrelevant evidence. Relevant evidence is any evidence that has a tendency to make the existence of a fact of consequence in the case more probable or less probable than it would be without the evidence. *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57 (2000); *People v. Monroe*, 66 Ill. 2d 317, 321-22 (1977). In addition, a court may exercise its discretion and exclude evidence, even if it is relevant, if the danger of unfair prejudice substantially outweighs its probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Hanson*, 238 Ill. 2d 74, 102 (2010). Distinguishing between an experiment (substantive evidence) and the use of demonstrative evidence (explanatory evidence) is sometimes difficult and confusing. See *People v. Hayes*, 353 Ill. App. 3d 355, 360 (2004); *Foster v. Devilbiss Co.*, 174 Ill. App. 3d 359, 365 (1988); Michael H. Graham, Graham's Handbook of Illinois Evidence § 401.11, at 190 (10th ed. 2010).

¶ 18     The foundational requirements for the admission of experiments or tests is "whether the 'essential conditions' or 'essential elements' of the experiment are substantially similar" to the conditions at the time of the accident. *Brennan v. Wisconsin Central Ltd.*, 227 Ill. App. 3d 1070, 1087 (1992). If an experiment is presented as a reenactment, the proponent must establish the test was performed under conditions closely duplicating the accident. *Brennan*, 227 Ill. App. 3d at 1087. When an experiment is designed to test only one aspect or principle related to the cause or result of the accident at issue, the exact conditions of the accident do not need to be replicated but that particular aspect or principle must be substantially similar. *Galindo v. Riddell, Inc.*, 107 Ill. App. 3d 139, 144 (1982). This court reviews evidentiary errors for an abuse of discretion. *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 463 (2009). The admission of demonstrative evidence that may confuse or mislead the jury, or prejudice a party, constitutes an abuse of the trial court's discretion. *Hernandez v. Schittek*, 305 Ill. App. 3d 925, 932 (1999). Where a trial court abuses its discretion in admitting evidence, a reviewing court should grant a new trial only where "the error was substantially prejudicial and affected the outcome of the case." *Taluzek v. Illinois Central Gulf R.R. Co.*, 255 Ill. App. 3d 72, 83 (1993).

¶ 19     It is proper to exclude experiments to determine the extent of visibility prior to the accident in question if the conditions are not substantially similar. See *Kent v. Knox Motor Service, Inc.*, 95 Ill. App. 3d 223, 226 (1981) (where type of vehicle, light condition, and conditions of highway in line-of-sight test were not the same, nor substantially the same, as during the accident, the trial court's refusal to admit experiment to determine extent of driver's visibility was not an abuse of discretion); *Amstar Corp. v. Aurora Fast Freight*, 141 Ill. App. 3d 705, 709 (1986) (proper to exclude videotape where the difference in vantage point from position of video camera and position of driver was significant and misleading); *French v. City of Springfield*, 65 Ill. 2d 74, 81-82 (1976) (city was prejudiced by improper admission of motion picture, which depicted area where accident occurred and preconditioned the minds of the jurors to accept the plaintiff's theory of the case). This court recently addressed the same issue presented here in *Johnson v. Bailey*, 2012 IL App (3d) 110016, and rejected arguments similar to those presented by the McDonough County defendants. In *Johnson*, the trial court improperly admitted photographs that the defense argued portrayed the layout of the gas station parking lot where the plaintiff was injured in a collision with the defendant. *Johnson*, 2012 IL App (3d) 110016, ¶ 15. One vehicle shown in the photo accurately represented the position of the defendant's vehicle but the second vehicle in the photo was not in a location substantially similar to the location of the plaintiff's vehicle when the accident occurred. *Johnson*, 2012 IL App (3d) 110016, ¶ 15. In addition to depicting the lot's layout and traffic flow, the photos also showed an inaccurate location of the plaintiff's vehicle, which we considered could mislead the jury. *Johnson*, 2012 IL App (3d) 110016, ¶ 15. Because the photographs did not accurately portray the location of plaintiff's vehicle, we found that the foundation was incomplete and the plaintiff was prejudiced by their improper admission. *Johnson*, 2012 IL App (3d) 110016, ¶ 16.

¶ 20     The same circumstances are present in the instant case. The video does not meet the test for admissibility of experimental evidence. For the video to satisfy the foundational requirements, the defense needed to establish that the essential conditions of the line-of-sight experiment were substantially similar to those that existed when the accident occurred. It is undisputed that the essential conditions regarding line of sight were not substantially similar

when the video was created. The pursuit involved speeds in excess of 100 miles per hour, while the SUV and squad car in the video were driving at 40 miles per hour. The vehicles in the experiment were in a different lane than the SUV and Pledge's vehicle, and standing traffic is visible in the video that was not present when the accident occurred. The SUV's lights were on in the video, contrary to the pursued SUV, which had turned off its lights during the pursuit. The video was taken from a static position in the left-turn lane, while the evidence at trial suggests Amanda's minivan was consistently moving through the intersection.

¶ 21      The McDonough County defendants expressly admit the differences exist, but argue that they go to the weight the jury should give the evidence, not to its admissibility. The defendants assert the jury was informed repeatedly throughout the trial that the line-of-sight experiment was not a re-creation of the accident. We agree with the defense that it repeatedly informed the jury that the video was not a re-creation. Nevertheless, that does not relieve the McDonough County defendants of the obligation to demonstrate that the essential conditions of the line-of-sight evidence offered by their expert were substantially similar to the conditions as they appeared in Amanda's line of sight at the time of the accident. The various differences, as discussed above, preclude any substantial similarities regarding line-of-sight conditions. Like the defendant in *Johnson*, the McDonough County defendants cannot establish that the essential conditions regarding Amanda's line of sight were substantially similar to the conditions existing when the video experiment was performed. Because the defendants cannot satisfy the requirements for the admission of demonstrative evidence, we find the video was admitted in error.

¶ 22      We further find that the improper admission prejudiced the Daytons. A critical issue in the case was Amanda's negligence. The effect of the video was to precondition the jury to accept the defense's theory of the accident. Because its essential conditions were not substantially similar to conditions when the accident took place, the video had the potential to confuse and mislead the jury. The video depicted a different scene than Amanda would have seen when the accident occurred and offered a portrayal of the accident's circumstances favorable to the defense. The prejudicial impact of the video outweighed its probative value and precluded its admission.

¶ 23      We find that the trial court abused its discretion in allowing the video to be admitted into evidence and that the Daytons are entitled to a new trial. Although the resolution of the first issue is dispositive, we briefly address the other issues the Daytons raise on appeal to the extent they are likely to arise in the new trial.

¶ 24      The Daytons challenge the limiting instruction provided by the trial court regarding the defense video, asserting it was confusing, prejudicial and improper. We agree. The Illinois Pattern Jury Instructions provide the following instruction on evidence admitted for a limited purpose:

> "The following evidence concerning [(describe evidence)] is to be considered by you solely as it relates to [(limited subject matter)]. It should not be considered for any other purpose." Illinois Pattern Jury Instructions, Civil, No. 2.02 (2000) (hereinafter, IPI Civil (2000) No. 2.02).

The trial court instructed the jury as follows:

> "The witness has explained why the video was produced and you should consider it only for purposes of the consideration that the witness took of the information that's

contained therein. You can consider the material for that purpose in deciding what weight, if any, you give the opinions that have been testified to by the witness."

¶ 25    The trial court's limiting instruction did not track the language of the applicable pattern jury instruction. See IPI Civil (2000) No. 2.02. The trial court must give instructions that fairly and accurately state the law and are clear enough so the jury is not misled. *Eskew v. Burlington Northern & Santa Fe Ry. Co.*, 2011 IL App (1st) 093450, ¶ 31. The limiting instruction given by the trial court did not clearly or comprehensively inform the jury that the video's limited purpose related only to line of sight as the basis for the defense expert's opinion.

¶ 26    The Daytons also challenge the trial court's limitation on their closing argument, arguing that the trial court prevented them from offering an inference arising from the squad car video. In closing argument, counsel for the Daytons inferred that the squad video depicts a five-second period when Amanda could see the approaching squad based on when her minivan comes into view on the video. We consider the Daytons' argument to be supported by the evidence presented. The squad video, admitted as substantive evidence without objection, was viewed by the jury, which was capable of determining the amount of time it thought Amanda had to see the squad car. The opinion of the defense expert that the squad was visible to Amanda for 13 seconds was based on his viewing of the squad video. The jury was free to reject his conclusion in favor of its own determination based on what the jurors saw in the squad video, which was equipped with audio and an onscreen timer. Watching the video and counting the seconds are not beyond the ken of the ordinary juror and not subjects limited to expert testimony. *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 412-13 (2005). At retrial, the trial court should not limit the Daytons' presentation of this argument, if appropriate.

¶ 27    Lastly, the Daytons argue that the trial court improperly allowed the defense expert to testify regarding Amanda's duty and that the testimony misstated Illinois duty law and prejudiced them. We find there was no error in O'Hern's testimony regarding Amanda's duty. It is well settled that an expert may opine on an ultimate fact or issue as long as the other requirements for the expert testimony are met. *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1071 (2007). O'Hern testified that Amanda had a duty to yield to Pledge's emergency vehicle before executing the left turn and that, based on his training, education and experience, the cause of the accident was Amanda's failure to yield. O'Hern's opinion does not impermissibly intrude on the jury's role because the jury was free to reject O'Hern's opinion. *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 545 (1995).

¶ 28    The dissent claims that it is not necessary to reach the evidentiary issues because, as a matter of law, the Daytons cannot demonstrate that Pledge's actions were willful and wanton. To adopt the view of the dissent would be to grant immunity to the police in this circumstance when the legislature has specifically declined to do so in the Tort Immunity Act. See *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248, 259 (2003).

¶ 29    The facts in this case are similar, but not identical, to cases cited by the McDonough defendants, and are likewise similar, but not identical, to cases cited by the Daytons in support of each side's argument concerning the imposition of a duty. See, *e.g.*, *Hall v. Village of Bartonville Police Department*, 298 Ill. App. 3d 569 (1998); *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248 (2003). It is precisely because of the intense focus on the particular facts of each case that the determination of whether Pledge's actions were willful

and wanton are factual matters for the jury to decide. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 45.

¶ 30    In denying the motion for summary judgment, the trial court found there were many factors that weighed for and against a determination of willful and wanton conduct and such a determination was a jury question. Evidence was presented at trial bearing on whether Pledge's pursuit was willful and wanton and included the following. Pledge testified he knew the license plate number of the SUV before the pursuit began; he knew that the Macomb police department had placed spike strips to stop the fleeing SUV; other accidents involving vehicles turning left had occurred at the intersection; and there was an increased population in the area of the intersection because school was in session and it was a holiday weekend. Pledge was also aware that his speed reached 110 miles per hour at one point in the pursuit. He saw the Dayton vehicle in the center lane intending to turn left. Pledge believed that the SUV would crash during the pursuit and that the SUV created a "huge safety concern" to vehicular and pedestrian traffic by traveling with its lights off.

¶ 31    Pledge also acknowledged the existence of and his familiarity with the sheriff's department pursuit policy. The policy allowed officers to engage in a high-speed pursuit only with the "utmost safety" and when the officer knows or has reasonable grounds to believe that the subject of the pursuit has committed or is going to commit a serious felony. A serious felony is one involving "an actual or threatened attack." Pledge did not know at the time of the pursuit whether the SUV driver had committed or was going to commit a serious felony involving "actual or threatened attack." He admitted the pursuit did not meet the criteria of the policy but believed it was proper under the circumstances. Pledge admitted it was unlikely the SUV was going to stop as a result of the pursuit and in light of its flight from the earlier stop and extinguishing its lights to avoid detection by the police. Lastly, an eyewitness to the accident testified that she saw the minivan begin the left turn and then get hit by the squad car. The officer did not attempt to swerve or brake and she did not observe the squad car's brake lights come on. Based on the evidence presented, we find that the trier of fact is entitled to determine whether Pledge's actions were willful and wanton after considering all of the evidence.

¶ 32    For the foregoing reasons, the judgment of the circuit court of McDonough County is reversed and the cause remanded.

¶ 33    Reversed and remanded.


¶ 34                    SEPARATE OPINION UPON DENIAL OF REHEARING

¶ 35    JUSTICE SCHMIDT, concurring in part and dissenting in part.

¶ 36    As the majority notes, plaintiffs raise four arguments on appeal: two issues relate to the line-of-sight video, one relates to the trial court allegedly limiting plaintiffs' argument during closing, and the final issue concerns the defense expert's testimony regarding Amanda's duty. *Supra* ¶ 15. I concur with the majority that the trial court committed no error in allowing the defense expert to opine on Amanda's duty. I dissent from the remainder of the majority's opinion.

¶ 37    The three remaining issues cannot serve as a basis to nullify the jury's verdict for numerous reasons. First, this matter never should have proceeded to trial, rendering any

potential trial errors harmless. Second, assuming that the trial court properly denied defendants' motion for summary judgment, it did not abuse its discretion when admitting the line-of-sight video, instructing the jury or during plaintiffs' closing argument. Finally, the jury's verdict makes clear that it found Deputy Pledge did not act willfully or wantonly. As the alleged errors are only relevant to Amanda's comparative fault and have no bearing on Pledge's actions, they are harmless at best. Even if the verdict had not made it clear, the verdict in favor of defendants and against Amanda is a general verdict. The alleged error only went to Amanda's alleged negligence. If we cannot know on which basis the jury ruled, the error is not reversible. *Witherell v. Weimer*, 118 Ill. 2d 321 (1987).

¶ 38                    I. Defendants' Motion for Summary Judgment/Directed Verdict

¶ 39      It is clear that this case never should have gone to trial and, therefore, any errors in evidentiary rulings are, at best, harmless and not a proper basis for reversal. *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 784-85 (2006). Likewise, defendants' motion for directed verdict should have been granted. The evidence at trial clearly establishes that defendants' motion for summary judgment should have been granted. While those with nothing more important to do can sit and ponder whether Pledge's decision to follow the fleeing vehicle was negligent, no reasonable person could conclude that his actions constituted willful and wanton conduct. As a matter of law, the deputy's conduct did not constitute willful and wanton misconduct.

¶ 40      Willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2010). Our supreme court has held that "[w]illful and wanton conduct is found where an act was done with actual intention or with a conscious disregard or indifference for the consequences when the known safety of other persons was involved." (Internal quotation marks omitted.) *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 451 (1992).

¶ 41      The defendants argue that any errors in evidentiary rulings were harmless because the plaintiffs, as a matter of law, failed to prove that Pledge was guilty of willful and wanton conduct. In dealing with this argument, the majority virtually ignores all the case law cited by defendants, including cases from this court affirming summary judgment granted in police pursuit cases. The majority's "analysis" consists of saying that the cases cited by defendants in support of their arguments contained "similar, but not identical" facts to those presented here. *Supra* ¶ 29. The majority does not explain what facts made this case similar to the case cited by plaintiffs, or why the facts in this case compel a result different than those reached in the cases cited by defendants.

¶ 42      The majority simply proclaims, "It is precisely because of the intense focus on the particular facts of each case that the determination of whether Pledge's actions were willful and wanton are factual matters for the jury to decide." *Supra* ¶ 29. If that is a correct statement of the law, then summary judgment, directed verdict and judgment *n.o.v.* are all dead letters. One can only conclude that the majority rejects the notion of taking any issue away from the jury. If so, some transparency would be helpful. If the issues presented here are always jury questions, then the cases cited by defendants are wrong and the majority should say that it is rejecting them.

¶ 43    The majority argues above (*supra* ¶ 28) that to adopt my view would be to grant the police immunity in this circumstance, despite the legislature's failure to do so. Of course, this argument is disingenuous. Neither defendants nor I have argued for immunity for willful and wanton misconduct. Defendants' argument is straightforward; Pledge's conduct in this case did not, as a matter of law, rise to the level of willful and wanton misconduct. Stated in another way, Pledge's conduct in this case did not create a jury question as to whether it rose to the level of willful or wanton misconduct. Nonetheless, the majority's mischaracterization of the dissent is probably the strongest argument in the majority opinion.

¶ 44    Likewise, in paragraph 29 above, the majority refers to "each side's argument concerning the imposition of a duty." Neither side argued, nor do I, about the imposition of a duty. First of all, if the existence of a duty were the issue that would clearly be a question of law. No one has argued that the defendant did not have a duty to refrain from willful and wanton misconduct. The majority then cites *Doe-3 v. McLean County Unit District No. 5* for a general proposition of law which that case does not support.

¶ 45    *Doe-3* involved a lawsuit brought by pupils of a Champaign County school that were molested by a teacher who previously worked in a McLean County school. *Doe-3*, 2012 IL 112479, ¶ 3. The pupils claimed the McLean County school district acted willfully and wantonly by failing to fully disclose the teacher's work history. *Id.* ¶ 8. The defendant McLean County school district filed motions to dismiss pursuant to sections 2-615 and 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619.1 (West 2010)), claiming it owed no duty of care to students in the Champaign County school district. *Doe-3*, 2012 IL 112479, ¶ 9. Our supreme court very clearly stated, in its opening line of *Doe-3*, that the "issue in this case is whether defendants owed plaintiffs a duty of care." *Id.* ¶ 1.

¶ 46    The majority herein cites to paragraph 45 of the *Doe-3* opinion, claiming it mandates in "each case that the determination of whether Pledge's actions were willful and wanton are factual matters for the jury to decide." *Supra* ¶ 29. What the *Doe-3* court actually said in paragraph 45 is this:

> "Finally, we emphasize that our holding in this case is limited *to finding, under the particular circumstances presented here, that the allegations in plaintiffs' complaints are sufficient to establish that defendants owed plaintiffs a duty of care*. We express no opinion on whether defendants have breached their duty of care, whether defendants acted willfully and wantonly, and whether defendants' breach was a proximate cause of plaintiffs' injuries, which are factual matters for the jury to decide." (Emphasis added.) *Doe-3*, 2012 IL 112479, ¶ 45.

¶ 47    Again, there is no dispute amongst the parties herein that Pledge owed plaintiffs a duty to refrain from acting willfully and wantonly. The majority cites to *Doe-3* in an attempt to avoid distinguishing cases that hold a court may decide, as a matter of law, whether an officer acted willfully and wantonly when conducting a high speed pursuit.

¶ 48    One such case is *Hall v. Village of Bartonville Police Department*, 298 Ill. App. 3d 569 (1998). In *Hall*, the driver of a vehicle that collided with a truck, which was being pursued by police, filed suit against the pursuing officer "alleging violations of department procedures, willful and wanton conduct, and reckless disregard for the safety of others." *Id.* at 570-71. In affirming summary judgment on behalf of the officer and his department, this court highlighted main facts contained within the record, including: (1) the truck driver's perceived intoxication; (2) the officer activated his lights and siren; (3) the officer noted the truck's

license plate number before the truck accelerated and sped off; (4) the chase occurred on a four-lane highway; (5) the location of the chase was not a densely populated urban area; (6) the weather was clear; (7) the road was dry; (8) the duration of the chase was relatively brief; and (9) the chase reached speeds of 105 miles per hour near the town of Bartonville. Based on those facts, this court affirmed the trial court's conclusion, that as a matter of law, "the officer did not act in disregard for the safety of others." *Id.* at 573.

¶ 49    The facts of *Hall* are incredibly similar to the case at bar. Yet, the majority relieves itself of its duty to explain why both the trial court and this court properly found the police officer in *Hall* did not act willfully or wantonly, as a matter of law, and yet a similar determination would be improper in this matter. The closest the majority comes to explaining why judgment as a matter of law is inappropriate in this case can be found at paragraph 30, *supra*. In it, the majority notes that Pledge knew the license number of the offending vehicle. So did the officer in *Hall*.

¶ 50    This is not a case where the officer would reasonably think, "Oh, I'll arrest this guy tomorrow." It is a case where a reasonable officer would think, "I've gotta get this idiot off the road."

¶ 51    The majority then misquotes the record, claiming Pledge "knew that the Macomb police department had placed spike strips to stop the fleeing SUV." *Supra* ¶ 30. He knew no such thing. During the 75-second chase, he heard over his radio "the Macomb Police Department talking about putting out spike strips." He had no knowledge of where the Macomb police department might eventually put the spike strips. He had limited knowledge of how spike strips worked as his department did not use them. Since Pledge had "no assumption of where it was going to go," I fail to see how the Macomb police department discussing the possibility of setting up spike strips at a location unknown to Pledge is evidence of willful and wanton conduct. There was no other evidence regarding the spike strips. Query: Just how would the Macomb police know where to put the spike strips unless someone was behind the reckless driver reporting his position?

¶ 52    The majority further cites the fact that Pledge "was also aware that his speed reached 110 miles per hour at one point in the pursuit" as evidence "weighed for" a "determination of willful and wanton conduct." *Supra* ¶ 30. Again, willful and wanton conduct can only be found where an act is done with actual intention to harm or with a conscious disregard or indifference for the consequences of your actions. *Burke*, 148 Ill. 2d at 451. Uncontroverted evidence indicated that as the vehicles approached town, Pledge had decreased his speed to between 70 and 75 miles per hour. The majority fails to explain how a jury could reasonably conclude that Pledge's decision to significantly slow down as he entered town evinced an utter indifference for the safety of others. Instead, the majority simply states that Pledge knew his speed reached 110 miles per hour sometime during the incident. That is irrelevant. Had Pledge maintained that speed, he would have been through the intersection before Amanda turned.

¶ 53    The operative facts in this case are as follows: (1) the driver of the van fled a traffic stop and drove at a high rate of speed at night with no lights. (2) Pledge made the snap decision that it was best to follow this vehicle rather than let the vehicle continue to drive at a high speed with no lights. (3) The pursuit in this case was not the basis for the erratic driving by the suspect vehicle. It was in response to a citizen complaint to 911, reporting the suspect vehicle driving in an "erratic and menacing" manner. (4) Pledge had his lights and siren

activated. (5) The pursuit occurred on a four-lane highway. (6) The location of the pursuit was not a densely populated urban area. (7) The weather was clear. (8) The road was dry. (9) The visibility was good. (10) The duration of the pursuit from the time the suspect vehicle fled the traffic stop to the collision was only 75 seconds. (11) Pledge entered the intersection on a green light. (12) The police officer's speed at the time of impact was between 70 to 75 miles per hour. (13) Sixteen-year-old Amanda Dayton Nehring made a left turn into the path of the oncoming police car, turning between the suspect vehicle and the police car.

¶ 54    To summarize, Pledge had his first encounter with the suspect vehicle after a citizen complaint about the nature of the vehicle's driving. This obviates any argument that it was the presence of the police officer that caused the dangerous driving of the suspect vehicle. After the stop, the suspect vehicle fled toward Macomb at a high rate of speed with no lights. Pledge made a determination that it was better to try to stop that vehicle than it was to let it go. I should not need to list the obvious dangers to the public by a vehicle driving at a high rate of speed at night with no lights. The fact that the collision took place between the plaintiffs' vehicle and the squad car as opposed to the plaintiffs' vehicle and the suspect vehicle is simply a cruel twist of fate. Had the squad car not slowed, or had it gone faster, it likely would have been through the intersection before Amanda made the turn.

¶ 55    No reasonable person could conclude that this deputy's decision to try to stop a vehicle that was driving at night at high speeds with no lights constituted willful and wanton behavior. As a matter of law, any error was harmless. Imagine, if you will, a police officer parked by the side of the road when a speeding car passes by at night with no lights. Would any thinking person suggest that the officer should do nothing because adding a police car with lights and siren to the mix would increase the danger?

¶ 56    In this case, we have a driver who is driving in an erratic and dangerous manner prompting at least one citizen to call the police. Pledge got behind him, observed more such conduct and made the stop. After stopping, the vehicle then fled, turning off its lights and driving at a high speed. Pledge determined that the best thing to do was try to stop that vehicle. Tragically, this accident happened when a 16-year-old driver made a left turn into the path of a police car, which was coming into an intersection at a high speed with its lights and siren activated. To suggest that Pledge's conduct in deciding to try to stop the suspect vehicle constituted willful and wanton misconduct or that a jury could find willful and wanton misconduct on these facts flies in the face of common sense and numerous reported decisions. See, for example, *Urban v. Village of Lincolnshire*, 272 Ill. App. 3d 1087 (1995); *County of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998); *Wade v. City of Chicago*, 364 Ill. App. 3d 773 (2006).

¶ 57    Plaintiffs argue that the deputy violated department guidelines; maybe so, but most probably not. Regardless, this deputy did what any reasonably qualified and conscientious police officer would have done faced with the same situation. More importantly, a violation of self-imposed rules or internal guidelines does not constitute evidence of willful and wanton misconduct. *Wade*, 364 Ill. App. 3d at 781.

¶ 58                        II. Claimed Errors Are Harmless

¶ 59    Even if the trial court erred when admitting the video, instructing the jury as to the video and commenting during plaintiffs' closing arguments, such alleged errors are harmless as a matter of law as all three of those issues are only relevant to Amanda's comparative fault.

- 13 -

None of those issues are relevant to whether Pledge acted with willful or wanton disregard for the safety of others.

¶ 60  If a circuit court commits an evidentiary error or errs when instructing a jury, "we must determine if that error is harmless or reversible." *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 429 (2009). A "party is not entitled to reversal based upon the trial court's evidentiary rulings unless the error substantially prejudiced the aggrieved party and affected the outcome of the case." *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 848 (2010). "The party seeking reversal bears the burden of establishing such prejudice." *Id*. The alleged errors of which plaintiffs complain are harmless.

¶ 61  Reversal is in no event appropriate as to the jury's verdict in favor of defendants and against Amanda. With no objection from Amanda's counsel, the trial court instructed the jury to complete verdict form K in favor of the defendants if "you find for defendants against Amanda Dayton Nehring on Count IX of the complaint, or if you find that plaintiff Amanda Dayton Nehring's contributory negligence was more than 50% of the total proximate cause of the injury or damage for which she seeks recovery."

¶ 62  Amanda's counsel chose not to ask, through special interrogatory, whether any defense verdict against her was based on the jury's belief that Pledge did not act willfully or wantonly or whether it was based on the belief that Amanda was more than 50% contributorily negligent for this accident. We need not speculate on the issue, as when "there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the [party], having failed to request special interrogatories, cannot complain." *Witherell v. Weimer*, 118 Ill. 2d 321, 329 (1987). Therefore, the alleged errors, even if error, are not reversible.

¶ 63  Moreover, it is clear from a review of the jury instructions and verdict forms returned that the jury found Pledge's actions were not willful and wanton. While defendants filed an affirmative defense against Amanda arguing comparative fault, the jury instructions clearly state that if "you find that there was negligence on the part of the driver of the vehicle in which Mark Lorenz and Jill Dayton were riding, then the driver's negligence cannot be charged to these passengers." Undoubtedly, the verdict forms returned in favor of the passengers necessitated a finding that Deputy Pledge did not act willfully and wantonly toward those plaintiffs.

¶ 64  The errors complained of are irrelevant with respect to whether Pledge acted willfully or wantonly. The majority acknowledges that these errors weigh only upon Amanda's comparative fault. While discussing the line-of-sight video, the majority makes no comment regarding how Amanda's line of sight is relevant whatsoever to Pledge's actions, yet acknowledges that "[a] critical issue in the case was Amanda's negligence." *Supra* ¶ 22. Again, it is the plaintiffs' burden to explain how these errors substantially prejudiced them and affected the outcome of the case. *Id*. Plaintiffs, and the majority, have failed to explain how Amanda's line-of-sight, or whether Amanda could see the squad car for more than five seconds, renders Pledge's decision to pursue the vehicle more or less willful and wanton. Undoubtedly, those matters are relevant to Amanda's comparative fault. However, the jury instructions and verdict forms indicate the jury clearly found Pledge did not act willfully and wantonly. As the alleged evidentiary errors are irrelevant to that finding, any potential error is harmless.

¶ 65                              III. No Abuse of Discretion

¶ 66        I disagree with the majority's conclusions that the trial court abused its discretion when admitting the line-of-sight video, instructing the jury regarding the video and when commenting on plaintiffs' five-second argument during closing arguments.

¶ 67                              a. Line-of-Sight Video

¶ 68        The majority acknowledges that the "jury was informed repeatedly throughout the trial that the line-of-sight experiment was not a re-creation of the accident" (s*upra* ¶ 21) yet, nevertheless, concludes that for "the video to satisfy the foundational requirements, the defense needed to establish that the essential conditions of the line-of-sight experiment were substantially similar to those that existed when the accident occurred" (s*upra* ¶ 20). The majority uses that passage to create a more exacting standard than our rules of evidence employ.

¶ 69        The majority acknowledges, then ignores, the evidentiary rule which holds that "when an experiment is not represented to be a reenactment of the accident and it deals with *one aspect* or principle directly related to the cause or result of the occurrence, the *exact conditions* of the accident need not be duplicated." (Emphases added.) *Galindo*, 107 Ill. App. 3d at 144; *supra* ¶ 18. Clearly, the trial court found that the line-of-sight aspect of the accident and of the video were substantially similar to warrant the video's introduction into evidence for the limited purpose of showing that singular aspect of the occurrence. I find that the trial court did not abuse its discretion on the matter. The authorities cited by the majority, *Kent*, *Amstar Corp.*, *French*, and *Johnson* (s*upra* ¶ 19) do not persuade me otherwise.

¶ 70        In *Kent* and *Amstar Corp.*, each appellate court deferred to the discretion of the trial court when measuring the similarities or differences between the actual facts of the accident and the circumstances under which the videos sought to be introduced into evidence were created. *Kent*, 95 Ill. App. 3d at 225 ("The narrow issue to be determined is whether in the instant case the trial court abused its discretion by its ruling."); *Amstar Corp.*, 141 Ill. App. 3d at 709 ("We believe, therefore, that the court's discretion was not abused.").

¶ 71        In *French*, our supreme court found the trial court erred when admitting a video with the stated "purpose *** to familiarize the jury with the area surrounding the accident." *French*, 65 Ill. 2d at 81. In reversing the trial court's decision to admit the video, the *French* court specifically noted that the proffered video "was filmed in daylight, while the accident occurred at night." *Id.* at 82. Moreover, the *French* court found that the trial judge made comments suggesting "that the film was a dry run of the events which occurred the night of the collision." *Id*. No comments exist in the case at bar suggesting that the trial judge led the jury to believe this video was a "dry run" of the events of the night of the accident. Furthermore, both the video introduced herein and the accident occurred at night rendering this case significantly different than *French*.

¶ 72        The majority further justifies its decision to ignore the trial court's discretion and negate the jury verdict by citing to *Johnson*, 2012 IL App (3d) 110016, a case in which a majority of this court followed a similar path. Strangely, the dissenting member of the *Johnson* court now cites *Johnson* with approval. I agree with the assessment of the dissent in *Johnson* that the *Johnson* majority failed to give proper deference to the trial court and the standard of review, instead, choosing to independently consider each similarity and difference between the photograph and scene, which were matters "that went to the weight of the evidence and

- 15 -

not to the admissibility of the evidence." *Johnson*, 2012 IL App (3d) 110016, ¶ 26 (Carter, J., dissenting).

¶ 73    After observing the testimony of the witnesses, the trial court found sufficient similarities between the video and the facts of the accident to admit the video for the limited purpose of showing the line-of-sight of vehicles traveling in the direction of plaintiff's vehicle. I cannot say no reasonable person could agree with the position taken by the trial court.

¶ 74                                   b. Jury Instruction

¶ 75    I also disagree with the majority's conclusion that the trial court's limiting instruction amounted to reversible error. *Supra* ¶ 25. Even assuming the instruction was erroneous for failing to follow IPI Civil (2000) No. 2.02 as the majority claims, such error is reversible only if it prejudiced the complaining party by misleading the jury and affecting the outcome of the trial. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 273 Ill. App. 3d 977 (1995).

¶ 76    Ignoring the prejudice requirement, the majority concludes that the instruction amounted to reversible error as it "did not clearly or comprehensively inform the jury that the video's limited purpose related only to line of sight as the basis for the defense expert's opinion." *Supra* ¶ 25. The majority cannot seriously be claiming that the jury was confused regarding the purpose of the video.

¶ 77    Four short paragraphs above its conclusion, the majority "agree[s] with the defense that it repeatedly informed the jury that the video was not a re-creation." *Supra* ¶ 21. Moreover, just prior to the introduction of the video at trial, it's creator, O'Hern, stated:

> "The purpose of the video was there was–Mr. Johnson had given some indication that there were trees and stuff that blocked the view or the line of sight for Amanda Dayton and that was one of the issues of why she couldn't see the squad car approaching. So obviously, going there in the daylight you can sit in that turn lane or be in that turn lane and look all the way down University Drive, see it all the way to Tower Road. So you could see it during the day. We did a video to just show that at night you can see all the way down there regardless of the lane you're in. And, furthermore, that you can see the flashing lights of the squad car as it approaches the intersection."

¶ 78    The number of times the parties referred to the video as a line-of-sight video and reminded the jury that it was not a reenactment are too numerous to count. Plaintiffs' own counsel highlighted this fact as, on cross-examination, plaintiffs' counsel read a part of O'Hern's deposition transcript in which O'Hern testified that the reason the video was created was due to "an issue with one of the–with your expert, your pursuit expert, indicating that the shrubbery and bushes and stuff played a part in the visibility." To suggest that the jury was misled by the court's instruction regarding the video or the instruction somehow prejudiced the plaintiffs is belied by the record on appeal.

¶ 79              c. Plaintiffs' "Five-Second" Argument on Closing

¶ 80    I also disagree with the majority's conclusion that the trial court committed reversible error by "limiting" the plaintiffs' ability to argue that it is reasonable to infer from the squad car video that Amanda could only see the squad car for five seconds before impact. During

plaintiffs' closing arguments, counsel reiterated his recollection of O'Hern's testimony, specifically that O'Hern opined that the squad car would have been visible to Amanda for 13 seconds.

¶ 81    While doing so, counsel played the squad car video, starting it and stopping it during the course of his arguments concerning what he believed the video showed. He stated, "If Mr. O'Hern is correct, then you will see Amanda Dayton's van at 32 minutes flat, because you will see it for 13 seconds, because Amanda has 13 seconds to see him. He has 13 seconds to see her. None of you are accident reconstruction people, but I bet all of you can see this tape. Let's look at the tape from 32 minutes for the next 13 seconds. And let's see if at 32 minutes, we can actually see Amanda Dayton."

¶ 82    After showing the jury the last 13 seconds of the video, plaintiffs' counsel stated, "When you look at the video of this accident which is in evidence, you will be able to understand the following simple point. Amanda Dayton and Officer Pledge saw each other for a total of five seconds. At the 32 minutes and eight seconds is the first time he saw her." Defense counsel objected, claiming no one testified to the five-second time frame. Plaintiffs' counsel responded that the five-second time frame is a reasonable inference from the squad car video as the jurors can see for themselves when Amanda's headlights come into focus.

¶ 83    The record reflects that the trial court never actually ruled on the objection. The court stated:

    "At no point did I hear anybody testify that there was a five-second window. So, let me just advise the jury that any statement made by a lawyer that's not based on the evidence should be disregarded by you. You should use your own recollection of the evidence, not mine, not the attorneys, your own. Again, I remind you that what the lawyers say during argument is not evidence. Okay."

¶ 84    Immediately thereafter, plaintiffs' counsel stated:

    "You will have the opportunity to judge for yourself. You will have an opportunity to look at the evidence. You will have an opportunity to see from the evidence how long Amanda Dayton and Officer Pledge had a chance to see each other. If I have misstated anything, ignore what I have said."

¶ 85    Plaintiffs' counsel continued noting, "We're going to run the tape again. *** I asked you to look at the tape and decide for yourself ***. All you have to do is look at the tape and judge for yourself. You don't need me to try and convince you of anything. *** See how long they can see each other. See when they can first see the car."

¶ 86    The record reflects, and the majority ignores, the fact that plaintiffs' counsel never sought a ruling on defendants' objection and the trial court never explicitly ruled on the matter. Counsel voluntarily abandoned his five-second argument; he was never forced to do so by the court. Our supreme court held long ago that where there is no ruling made on an objection, an appellate court has nothing to review. *Mitchell v. Chicago, B. & Q. Ry. Co.*, 265 Ill. 300 (1914). " 'To avail of an objection, counsel must insist upon a ruling of the trial court upon the objection, and must either obtain a ruling or a refusal of the court to rule. Mere failure to rule is not sufficient.' " *Karris v. Woodstock, Inc.*, 19 Ill. App. 3d 1, 10 (1974) (quoting *Cusanelli v. Steele*, 287 Ill. App. 490, 495 (1936), citing *City of Salem v. Webster*, 192 Ill. 369 (1901)).

¶ 87       The record is clear that the trial court never sustained defendants' objection to plaintiffs' counsel's five-second argument. Moreover, the trial court freely allowed plaintiffs' counsel to continue on his chosen course of arguing that the jury can draw its own conclusion as to whether Amanda's vehicle is visible for 13 seconds or some other amount of time. The trial court's statements on the matter are in no way reversible error.

¶ 88                                     IV. Conclusion

¶ 89       For the foregoing reasons, I find that the record contains no evidence that Deputy Pledge acted with willful and wanton disregard for the safety of others. As such, summary judgment/directed verdict should have been granted in favor of the defendants. I further find the trial court did not abuse its discretion when admitting the line-of-sight video or when instructing the jury as to the video's limited purpose. Similarly, the trial court did not err when commenting on plaintiffs' five-second argument during closing. Finally, plaintiffs' claims of error are only relevant to issues regarding Amanda's comparative fault and have no bearing on the issue of Pledge's alleged willful and wanton misconduct. As such, they cannot serve as bases to reverse. *Witherell*, 118 Ill. 2d at 339.